United States District Court
Southern District of Texas
**ENTERED**
January 24, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| NICHOLAS HECKFORD, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:20-CV-04366 |
| | § | |
| CITY OF PASADENA, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM & ORDER

Pending before the Court is the Motion for Summary Judgment filed by filed by Defendants Christopher Aaron, Mark Brinker, Josh Bruegger, Arnoldo Castillo, Baltazar Martinez, Eduardo Pecina, Aaron Perales, Richard Powell, Charlie Sanders, Allen Tabor, Willem Van Der Werff, and Phillip Warner. (Doc. 47). On January 14, 2022, the Court held a hearing on the Motion and took it under advisement. For the reasons set out forth below, the Court **GRANTS** the Motion **IN PART** and **DENIES** it **IN PART**.

I.    **BACKGROUND**

For the purposes of this Motion, the Court understands the facts as follows. On the evening of December 27, 2018, Plaintiff Nicholas Heckford met Jayme Faulkner at a Denny's restaurant in Pasadena, Texas. (Doc. 55-1 at 11–15.) Heckford ordered a mug of hot chocolate. (*Id.* at 15.) Faulkner spoke with Heckford for a while before she eventually left. (*Id.* at 25.) A Denny's employee then told Heckford to leave as well because a customer "heard [him] say the 'F' word[.]" (*Id.* at 29.) Heckford asked if he could finish his hot chocolate or have a to-go cup, but the Denny's employee said no. (*Id.* at 30–31.) In response, Heckford threw his mug on the floor. (*Id.*) The mug

1

shattered and a piece flew into a window near the cash register, cracking the glass. (Doc. 55-10 at 22.) Heckford then got into his car and left. (Doc. 55-1 at 32.) A Denny's employee reported Heckford to the Pasadena Police Department and several officers responded. (Doc. 47 at 3.) Dispatch gave the officers Heckford's license plate number, advised them that he had broken a window, and told them that this was a "no weapons" incident. (Doc. 55-2 at 1.)

Soon after Heckford left Denny's, he called the restaurant to take responsibility. (*Id.*) By that time, Pasadena police were already on the scene. (Doc. 55-15 at 4.) Consequently, a Denny's employee turned Heckford's call over to Officer Brinker. (Doc. 47-4 at 2.) Brinker, however, did not tell Heckford that he was a police officer. Instead, Brinker pretended to be the manager of the Denny's. (Doc. 55-1 at 37–38.) Brinker said that Heckford needed to come back to get the cracked window "squared away," and estimated that the damage would cost $50 to fix. (Doc. 10 at 2.) Brinker added that he would call the police if Heckford did not return. (*Id.*) Heckford responded that he was coming back to Denny's "to make things right[.]" (Doc. 55-1 at 38.)

In the meantime, Brinker positioned officers at strategic points around the parking lot and waited for Heckford to return. (Doc. 47-4 at 3–4; Doc. 55-10 at 3–4.) Within a few minutes, Heckford pulled back into the parking lot. (Doc. 47-4 at 8.) Officer Perales then approached Heckford's car and, through the open driver's-side window, told Heckford to get out because he was under arrest for criminal mischief. (Doc. 55-15 at 5–8.)

The parties disagree about what happened next. Heckford says that he opened the car door, put his left foot out of the car, and held up his lit cigarette in his left hand. (Doc. 55-1 at 44.) Heckford says he was going to tell Perales that he had a cigarette because "it's considered a weapon" and so he "tell[s] every officer when [he's] pulled over because [he] wants to get rid of his [cigarette.]" (*Id.*) Heckford notes that he put his right hand on the steering wheel because he

weighed around 301 pounds and needed leverage to get himself out of his vehicle. (*Id.* at 33, 44, 49.) Before Heckford could tell Perales about the cigarette, however, he says that Perales grabbed him. (*Id.*) Heckford recalls that he was forced to drop his cigarette. (*Id.*) Heckford contends that Officers Perales and Aaron then tried to pull him out of his car. (*Id.* at 45.) Next, Heckford remembers Officers Perales, Aaron, and Brinker punching him in the head. (*Id.* at 46–48.) Heckford says that while the officers punched him, he yelled: "Will y'all please let me get out." (*Id.* at 50.)

Heckford states that shortly after the officers began punching him in the head, he was struck on the back of his right shoulder by an officer on the passenger's side and shoved out of the car. (*Id.*) Perales and Aaron then wrestled him to the ground. (*Id.* at 54.) Heckford "threw [his] hands in front of him" so he did not "fall on [his] face." (*Id.*) While lying face-down on the ground, Heckford put his right arm behind him so the officers could handcuff him. (*Id.*) Heckford could not immediately give the officers his left hand, however, because it was pinned underneath him. (*Id.* at 55.) All the while, Heckford was yelling that he was trying to comply, that he needed help, that he was bleeding, and that he could not breathe. (*Id.* at 56–58.) Nevertheless, Officer Sanders put his knee on Heckford's head and pushed Heckford's face into the pavement. (*Id.* at 58–59.) Finally, the officers handcuffed Heckford and stopped beating him. (*Id.* at 61.) Apparently, other officers stood around and watched everything unfold. (*Id.* at 57, 61.) As a result of this confrontation, Heckford suffered a "right orbital blow out fracture" and "mildly displaced fractures of the right maxilla and bilateral nasal bones." (Doc. 55-33 at 6.) Heckford underwent surgery to fix these fractures with a metal plate and screws. (Doc. 55-1 at 60.)

The defendant officers, for their part, tell a different story. Perales contends that Heckford ignored several commands to get out of the car. (Doc. 55-15 at 5.) As a result, Perales says that he

had to take matters into his own hands. Perales says that he opened Heckford's car door and grabbed him. (*Id.*) Perales contends that Heckford then "lean[ed] into the car, turn[ed] his body and then . . . flick[ed] his lit cigarette in [Perales'] direction." (*Id.*) Perales was not burned by the cigarette, but some sparks flew and hit his arm. (*Id.* at 8.) Perales notes that Heckford also threw his hands inside the car, maybe to "anchor[] down" or to reach for something. (*Id.* at 5, 7.) Consequently, Perales punched Heckford two times in the face. (*Id.*) Officer Aaron, who was positioned next to Perales, also noticed that Heckford was not listening and "was kind of anchoring himself back in the car." (Doc. 55-18 at 5.) As a result, Aaron grabbed Heckford and tried to pull him out. (*Id.*) Aaron says that he did not strike Heckford while he was in the car. (*Id.* at 8.) Brinker, meanwhile, was walking to the car when he saw Perales and Aaron grabbing Heckford. (Doc. 55-27 at 5.) Brinker says that he saw Heckford hit Perales with a lit cigarette and realized that Heckford was refusing to get out.[1] (*Id.*) Consequently, Brinker raced to the car and punched Heckford twice in the head. (Doc. 55-27 at 6.) Officer Martinez, meanwhile, came in through the passenger's-side door and tried to push Heckford out. (Doc. 55-24 at 7.)

With Martinez's help, Perales and Aaron were able to wrestle Heckford onto the ground. (Doc. 55-27 at 6.) The officers contend that Heckford would not give them his arms so that they could handcuff him. (*Id.*) Perales then hit Heckford one or two more times in the head. (Doc. 55-15 at 7–8.) Aaron struck Heckford two or three times in the face. (Doc. 55-18 at 6.) And Brinker got "two knees on [Heckford's torso]" to inflict pain and encourage compliance. (Doc. 55-27 at 6.) Officer Sanders, meanwhile, said that he "knelt down while [Heckford] continued to resist," but that he "did not place [his] right knee on [Heckford's] head or face." (Doc. 55-22 at 2–4.) After

---

[1] Other officers, like Officer Sanders, agree that Heckford flicked his lit cigarette at Perales and tried to stay in his car. (*See e.g.*, Doc. 55-22 at 2.)

a few seconds, the officers were able to handcuff Heckford. (Doc. 55-27 at 7.) They then rolled

him onto his side and called an ambulance.[2] (*Id.*)

The only video of the incident comes from Brinker's body-worn camera ("BWC"). Brinker's BWC footage shows Heckford coming back to the Denny's (10:21), Perales and Aaron grabbing Heckford (10:41), Brinker joining the physical confrontation (10:43), several officers punching Heckford, Heckford pleading to be let out of his car (10:48), the officers throwing Heckford to the ground (10:57), Heckford telling the officers that he is trying to give them his other hand (11:00), Heckford saying that he cannot breathe (11:12), Heckford saying that he won't fight back (11:20), and the officers handcuffing Heckford and rolling him on to his side (11:30). (Doc. 8 at Ex. 4.) The footage does not show Heckford's initial interaction with Perales and Aaron, nor does it show Heckford throwing a lit cigarette.

## II.    STANDARD OF REVIEW

Summary judgment under Rule 56 "is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting FED. R. CIV. P. 56(c)). A genuine issue as to a material fact arises "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must draw all "reasonable inferences . . . in favor of the nonmoving party, but the nonmoving party 'cannot defeat summary judgment with conclusory allegations, unsubstantiated

---

[2] The Court notes that while Heckford related his version of events at a deposition, the officers told theirs through sworn affidavits and declarations. The officers' stories, then, have not been tested by the rigors of cross-examination.

assertions, or only a scintilla of evidence.' " *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007) (quoting *Turner v. Baylor Richardson Medical Center*, 476 F.3d 337, 343 (5th Cir. 2007)). "[T]he movant bears the initial responsibility of demonstrating the absence of a genuine issue of material fact with respect to those issues on which the movant bears the burden of proof at trial." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718 (5th Cir. 1995). "For any matter on which the non-movant would bear the burden of proof at trial, however, the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Id.* at 718–19.

## III.   ANALYSIS

Defendants' Motion features arguments from eleven police officers and the chief of the Pasadena Police Department. The Court begins its analysis with the arguments raised by Officers Perales, Aaron, Brinker, Martinez, and Sanders on Heckford's excessive-use-of-force claim. Then, the Court evaluates the arguments raised by Officers Pecina, Powell, Castillo, Tabor, Van Der Werff, and Warner on Heckford's failure-to-intervene claim. Finally, the Court addresses the arguments raised by Chief Bruegger on Heckford's failure-to-train and failure-to-supervise claims.

### A.   *Qualified Immunity and Excessive Use of Force*

Officers Perales, Aaron, Brinker, Martinez, and Sanders argue that they are entitled to qualified immunity on Heckford's excessive-use-of-force claim. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v.*

*Fitzgerald*, 457 U.S. 800, 818 (1982)). A government official is entitled to qualified immunity unless the plaintiff (1) alleges facts sufficient to "make out a violation of a constitutional right," and (2) shows that the constitutional right "was clearly established at the time of [the official's] alleged misconduct." *Id.* at 232 (cleaned up). Thus, qualified immunity is warranted unless no reasonable officer would have acted as the officer did. *Mason v. Faul*, 929 F.3d 762, 764 (5th Cir. 2019). "When evaluating a qualified immunity defense, courts 'consider[] only the facts that were knowable to the defendant officers.' " *Kokesh v. Curlee*, 14 F.4th 382, 392 (5th Cir. 2021) (quoting *White v. Pauly*, 137 S. Ct. 548, 550 (2017) (per curiam)).

Procedurally, qualified immunity "alters the usual summary judgment burden of proof." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). "Although nominally an affirmative defense, the plaintiff has the burden to negate the defense once it is properly raised[,] . . . "point[ing] out clearly established law . . . establishing that the official's allegedly wrongful conduct violated clearly established law[,] and [indicating] that genuine issues of material fact exist regarding the reasonableness of the official's conduct according to that law." *Kokesh*, 14 F.4th at 392 (cleaned up). Ultimately, the Court concludes that Officer Martinez is entitled to qualified immunity, but Officers Perales, Aaron, Brinker, and Sanders are not.

1.   <u>Whether the Officers Violated Heckford's Constitutional Rights</u>

The first question is whether the evidence, taken in the light most favorable to Heckford, creates a genuine issue of material fact as to whether the officers violated Heckford's Fourth Amendment right to be free from unreasonable seizures. *Rodriguez v. City of Laredo*, 459 F. Supp. 3d 809, 815 (S.D. Tex. 2020); *cf. Pearson*, 555 U.S. at 242 (allowing district courts to determine the order of operations when analyzing qualified immunity). To prove that the officers used excessive force in violation of the Fourth Amendment, Heckford "must show (1) an injury, (2)

which resulted directly and only from the use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009) (quoting *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009)).

The Fifth Circuit does not require that a plaintiff suffer a "significant injury" to claim excessive force, but "the injury must be more than *de minimis*." *Tarver v. City of Edna*, 410 F.3d 745, 752 (5th Cir. 2005) (citing *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999)). For example, "handcuffing too tightly, without more, does not amount to excessive force." *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001). Similarly, when the plaintiff cannot demonstrate any psychological injury and only claims that he was bruised by handcuffing, that too cannot support an excessive force claim. *Tarver*, 510 F.3d at 751–52.

Whether force is excessive and unreasonable depends on the totality of the circumstances. *Aguirre v. City of San Antonio*, 995 F.3d 395, 407 (5th Cir. 2021). The Supreme Court in *Graham* "established three guideposts for determining whether a particular use of force is reasonable: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to police officers or civilians; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by fleeing the scene." *Releford v. City of Houston*, 2016 WL 774552, at *3 (S.D. Tex. Feb. 29, 2016) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "The intent or motivation of the officer is irrelevant; the question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Roque v. Harvel*, 993 F.3d 325, 333 (5th Cir. 2021) (internal citations omitted). "Some amount of deference is afforded to the officer's discretion, as his or her service in real time, in unknown environs, often requires split-second decisions based on evolving information." *Releford*, 2016 WL 774552 at *3 (citing *Brown v. Glossip*, 878 F.2d 871, 873 (5th Cir. 1989)).

8

*Deville v. Marcantel* is instructive on the issue of excessive force. 567 F.3d 156 (5th Cir. 2009). In that case, Michell Deville was driving with her two-year-old granddaughter when she set her cruise control to the speed limit: 40 mph. *Id.* at 161. Officer Tarver, however, stopped Deville for going 50 mph. *Id.* Believing that she was wrongly stopped, Deville refused to heed Tarver's instructions to step out of her car and instead rolled her window up. *Id.* After Chief Marcantel arrived on the scene, he told Deville to lower her window or he would break it. *Id.* Deville did not comply. *Id.* at 162. As a result, Mercantel struck the window. *Id.* The window broke. *Id.* Mercantel and Tarver then pulled Deville out of her car and threw her against it, resulting in a blow to her midsection. *Id.*

Applying the *Graham* factors, the Fifth Circuit concluded that the officers were not entitled to qualified immunity on Deville's excessive-force claim. *Id.* at 167. The officers stopped Deville for a traffic violation, which made "the need for force substantially lower than if she had been suspected of a serious crime." *Id.* According to Deville's account, which the court credited on summary judgment, "there was no reason to believe that her actions posed a threat to the officers, herself, or to her grandchild." *Id.* There was also no indication that Deville "would flee or use the vehicle as a weapon." *Id.* Furthermore, Deville said that her resistance had been entirely passive: she simply refused to get out of the car. *Id.* Thus, it was unreasonable for Marcantel to "engage[] in very little, if any, negotiation," and "instead quickly resort[] to breaking [Deville's window] and dragging her out of the vehicle." *Id.* As a result, even though the officers said that Deville physically resisted arrest, a jury could "reasonably find that the *degree* of force the officers used in this case was not justifiable[.]" *Id.* at 168 (emphasis in original). The Fifth Circuit also reasoned that Deville's injuries evidenced an excessive use of force: she suffered wrist contusions, neuropathy in her hands, strains and bruises to her shoulders, and cuts from broken glass. *Id.*

i.    *Officer Perales*

The Court begins its analysis with Officer Perales. During Heckford's confrontation with the officers, he suffered a "right orbital blow out fracture" and "mildly displaced fractures of the right maxilla and bilateral nasal bones." (Doc. 55-33 at 6.) These injuries required surgery. (Doc. 55-1 at 60.) There is therefore no question that Heckford suffered serious injuries. And Perales, who admits to striking Heckford in the head, does not dispute that he injured Heckford.[3] The only remaining issue, then, is whether the force that Perales deployed was unreasonably excessive.

The first *Graham* factor—the severity of the crime—counsels against the use of physical force. Although the damage that Heckford wreaked on the window is in dispute—Heckford contends that repairs would cost $50, while Defendants' expert counters with $1,000—a reasonable officer would have suspected Heckford of committing misdemeanor criminal mischief at most. Tex. Penal Code § 28.03. To wit, Perales concedes that when he approached Heckford he was trying to arrest him for criminal mischief. (Doc. 15 at 5.) Shattering a mug and cracking a window is hardly major criminal action. *See Trammell v. Fruge*, 868 F.3d 332, 340 (5th Cir. 2017) (describing a misdemeanor like public intoxication as "a minor offense militating against the use of force"); *see Reyes v. Bridgwater*, 362 Fed. Appx. 403, 407 n.5 (5th Cir. 2010) (reasoning that the "severity" factor militates against the use of physical force where the alleged crime is a misdemeanor). Because a reasonable officer would only have suspected Heckford of committing a minor offense, the first *Graham* factor weighs against the use of serious physical force.

The second and third *Graham* factors—whether Heckford posed an immediate threat to officers and whether he actively resisted arrest—overlap here. Perales maintains that Heckford

---

[3] Indeed, among the officers accused of excessive force, only Officer Martinez (addressed in Part III-A-1-(iv)) disputes the issue of injury.

refused to get out of the car, anchored himself inside, and threw a lit cigarette at him. (Doc. 47 at 8.) Perales further contends that Heckford resisted arrest on the ground by keeping his left arm beneath his body and refusing to be handcuffed. (*Id.*) Consequently, Perales argues that force was warranted because Heckford posed an immediate threat and actively resisted arrest. Other officers agree with Perales' assessment. (*See e.g.*, Doc. 55-18 at 5–9.)

Heckford, however, paints a different picture. Heckford says that he responded to Perales' commands by opening his car door and putting his left foot out of the car. (Doc. 55-1 at 44.) Heckford says that he put his hand on the steering wheel to lift himself out because he weighed 301 pounds and required extra leverage. (*Id.* at 33, 49.) Heckford also states that he never threw his cigarette at Perales, but instead dropped it *after* the physical confrontation began. (*Id.* at 44.) Heckford further notes that, while Perales and other officers punched him, he asked them to let him get out of the car. (Id. at 50.) Additionally, Heckford says that, when he was on the ground, he voluntarily gave officers his right arm. (*Id.* at 54.) He tried to give the officers his left arm but could not immediately comply because they pinned his left arm beneath him. (*Id.* at 55–58.) While Heckford was on the ground, he also yelled that he was not trying to resist arrest, that he needed help, that he was bleeding, and that he could not breathe. (*Id.* at 58.)

Two pieces of extrinsic evidence support Heckford's account. First, the BWC footage depicts Heckford putting one of his legs out of the car, captures him pleading with the officers to let him get out, and reveals Heckford yelling that he was trying to comply while on the ground. (Doc. 8 at Ex. 4.) It does not show Heckford throwing a cigarette at Perales, it does not show Heckford trying to remain in his car, and it does not show Heckford actively resisting arrest when he was on the ground. Second, the declaration of Dr. Lance Platt corroborates Heckford's position. Dr. Platt, an expert in police use of force analysis, states that the officers "resorted to overwhelming

physical force rather than continuing oral negotiations with an individual who posed no immediate risk, and whom the officers stopped for a minor misdemeanor violation."  (Doc. 55-42 at 7.) Dr. Platt adds that the officers "violently struck an individual who was not actively resisting arrest."[4] (*Id.*)

Viewing this evidence in the light most favorable to Heckford, the Court concludes that a reasonable jury could find that Perales deployed an unreasonable and excessive amount of force. As in *Deville*, where Chief Marcantel "engaged in very little, if any, negotiation with [Deville]" and "instead quickly resorted to" physical force, Perales also engaged in little negotiation and instead resorted to physical force in under twenty seconds. *Deville*, 567 F.3d at 168. In fact, Perales' conduct appears even more egregious than the conduct of the officers in *Deville*. In *Deville*, the suspect admitted that she was passively resisting the officers' commands. Heckford, however, testified that he opened his car door and put one foot on the ground to comply. If it is unreasonable to break a car window and pull a suspect out of the car when they passively resist arrest, it is also unreasonable to punch a suspect multiple times in the head and pull them out of the car when they try to comply with instructions.

What's more, even if Heckford engaged in passive resistance, a jury could still find that Perales used unreasonable and excessive force. Perales punched Heckford in the face and threw him out of his car a few seconds after beginning negotiations as to a nonviolent misdemeanor. "[T]he speed with which an officer resorts to force is relevant in determining whether that force was excessive to the need." *Id.* at 342 (citing *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012)). Thus, even if Heckford ignored Perales' instructions, such passive resistance would not

---

[4] The Fifth Circuit has relied on Dr. Platt's analysis in cases like *Aguirre*. 995 F.3d at 408.

justify resorting to force in under twenty seconds. *Deville*, 567 F.3d at 168; *see Hanks*, 853 F.3d at 747 (reasoning that "an officer violates the Fourth Amendment if he abruptly resorts to overwhelming physical force rather than continuing verbal negotiations with an individual who poses no immediate threat or flight risk, who engages in, at most, passive resistance, and whom the officer stopped for a minor traffic violation").

Finally, a jury could find that Perales used unreasonably excessive force against Heckford while he was on the ground. "[P]olice officers are afforded considerable latitude in 'tense, uncertain, and rapidly evolving' situations." *Curran v. Aleshire*, 800 F.3d 656, 662 (5th Cir. 2015) (quoting *Poole v. City of Shreveport*, 691 F.3d 624, 629 (5th Cir. 2012)). But "when an arrestee is not actively resisting arrest the degree of force an officer can employ is reduced." *Darden v. City of Fort Worth, Texas*, 880 F.3d 722, 731 (5th Cir. 2018). Thus, in *Newman*, the Fifth Circuit "found that it was objectively unreasonable for officers to tase and strike an arrestee with a nightstick without resorting to less violent means when the arrestee's 'behavior did not rise to the level of active resistance.' " *Id.* (quoting *Newman*, 703 F.3d at 763) (cleaned up). Similarly, in *Bush*, the Fifth Circuit held "that it was objectively unreasonable for an officer to slam an arrestee's face into a vehicle when the arrestee 'was not resisting arrest or attempting to flee.' " *Id.* (quoting *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008)).

According to Heckford and Dr. Platt, Heckford was not actively resisting arrest. A reasonable officer in Perales' position would have known this. Interpreting the facts in the light most favorable to Heckford, Heckford was attempting to follow Perales' instructions on the ground. Heckford gave the officers his right hand and yelled that he was trying to comply. (Doc. 55-1 at 56–58.) Indeed, the only reason that Heckford could not immediately provide his left arm was that several officers were on top of him and his arm was pinned to the ground beneath him.

13

These facts, in conjunction with Heckford's attempted compliance in his car, would have indicated to a reasonable officer in Perales' shoes that Heckford was not actively resisting arrest. And if a reasonable officer would have realized that Heckford was not actively resisting, that officer would not have punched him in the head while he was lying facedown on the ground. *See Bush*, 513 F.3d at 502. Thus, a jury could also consider Perales' decision to strike Heckford while he was on the ground to be an unreasonable and excessive use of force.

Writ large, then, there is a genuine issue of material fact as to whether Perales violated Heckford's Fourth Amendment right to be free from unreasonable seizures. Perales' argument that he is entitled to qualified immunity because Heckford cannot make out a violation of his rights therefore falls short.

### ii.  *Officer Aaron*

The above analysis also holds true for Officer Aaron. Like Perales, Aaron suspected Heckford of committing a minor misdemeanor like "disturbance or criminal mischief." (Doc. 55-18 at 3.) Like Perales, Aaron resorted to physical force fewer than twenty seconds after Heckford returned to the parking lot by grabbing Heckford and attempting to throw him out of his car. (*Id.* at 5.) And like Perales, Aaron punched Heckford multiple times in the face while Heckford was lying on the ground. (*Id.* at 6.) In addition, while Aaron states that he did not punch Heckford until he was on the ground, Heckford contends that Aaron struck him while he was still in the car. (*Compare* Doc. 55-18 at 8 *with* Doc. 55-1 at 46–48.) Viewing these facts in the light most favorable to Heckford, a reasonable jury could conclude that Aaron acted just like Perales, using major force to arrest a suspected misdemeanant who was attempting to comply. Thus, a jury could "reasonably find that the *degree* of force that [Aaron] used in this case was not justifiable under the circumstances." *Deville*, 567 F.3d at 168 (emphasis in original). As a result, there is a genuine

issue of material fact as to whether Aaron violated Heckford's right to be free from unreasonable seizures. Like Perales, then, Aaron is not entitled to qualified immunity on this basis.

        *iii.*    <u>*Officer Brinker*</u>

A reasonable officer in Officer Brinker's shoes would also have known full well the minor nature of Heckford's offense and understood that it was inappropriate to escalate from verbal negotiation to physical force with a complying suspect in under twenty seconds. Thus, a reasonable jury could extrapolate from the evidence in the record—including Heckford's deposition, the BWC footage, and Dr. Platt's report—and conclude that Brinker's decision to race to the car and punch Heckford one to two times in the head was unreasonably excessive. *See Newman*, 703 F.3d at 763 (concluding that it was objectively unreasonable for officers to use a taser and hit an arrestee with a nightstick when the arrestee was not actively resisting arrest).

Still, Brinker is not identically situated to Perales and Aaron. Brinker was walking to Heckford's car when those officers began to use physical force on Heckford. Brinker also says that he saw Heckford throw a lit cigarette at Perales. But these observations alone do not save Brinker. First, there is a genuine dispute regarding the circumstances surrounding the cigarette. And second, it is not reasonable *per se* for an officer to use force simply because they witness another officer doing so. If that were the case, one officer's unconstitutional actions would naturally immunize the actions of subsequent officers. Taken to its logical extreme, such a position would consume the protections of the Fourth Amendment. Even though "police officers are afforded considerable latitude in 'tense, uncertain, and rapidly evolving' situations," that latitude has limits. *Curran*, 800 F.3d at 662 (quoting *Poole*, 691 F.3d at 629). Every officer on the scene must make their own determination regarding the reasonableness of the force they intend to deploy. Here, a reasonable officer in Brinker's position could have understood from the nature of Heckford's crime and the

fact that he was not actively resisting arrest that it was not reasonable to grab Heckford and punch him multiple times in the head. Thus, there is a genuine issue of material fact as to whether Brinker violated Heckford's right to be free from unreasonable seizures. Like Perales and Aaron, then, Brinker is not entitled to qualified immunity on this basis.

       *iv.*   *Officer Sanders*

The parties also disagree about Officer Sanders' role. Heckford states that while he was on the ground, Sanders put a knee on his head and pushed his face into the concrete. (Doc. 55-1 at 58–60.) The BWC footage is dark and difficult to decipher, but it does seem to depict an officer kneeling on Heckford's head. (Doc. 8 at Ex. 4.) Sanders, meanwhile, does not dispute that he was kneeing in the area of Heckford's head, but argues that he "was balanced on the balls of [his] feet" and "did not place [his] right knee on [Heckford's] head or face." (Doc. 55-22 at 2–4.)

Interpreting these facts in the light most favorable to Heckford, there is enough evidence in his deposition and the BWC footage to indicate that Sanders put his knee on Heckford's head. As a result, a reasonable jury could conclude that Sanders used unreasonably excessive force. In *Bush*, the Fifth Circuit held "that it was objectively unreasonable for an officer to slam an arrestee's face into a vehicle when the arrestee 'was not resisting arrest or attempting to flee.' " *Darden*, 880 F.3d at 731 (quoting *Bush*, 513 F.3d at 502). Here, several factors indicated that Heckford was not resisting arrest or attempting to flee. While on the ground, Heckford was yelling that he was trying to comply, that he could not breathe, and that he was not resisting. (Doc. 55-1 at 56–58.) Sanders also could have seen that Perales, Aaron, and Brinker were all on top of Heckford deploying physical force against him. And according to Dr. Platt's expert opinion, Heckford was not actively resisting arrest. Interpreting these facts in the light most favorable to Heckford, a reasonable officer in Sanders' position would have recognized that Heckford was not actively resisting arrest or

fleeing. Thus, a reasonable jury could conclude that Sanders also used unreasonable and excessive force against Heckford. Sanders is therefore not entitled to qualified immunity on this basis.

v.      *Officer Martinez*

Officer Martinez, for his part, argues that he did not injure Heckford. For Heckford to maintain an excessive-use-of-force claim against Martinez, he must have suffered an injury at Martinez's hands that was "more than *de minimis*." *Tarver*, 410 F.3d at 752. The only force that Martinez used against Heckford was when he went through the passenger's-side door to shove Heckford out of the car. (Doc. 55-24 at 7.) But Heckford admits that he sustained no physical injury from this action. (Doc. 55-1 at 51–52.) Thus, there is no genuine issue of material fact on the injury prong of Heckford's excessive-force claim against Martinez: Martinez did not injure Heckford. As a result, the Court holds that Officer Martinez is entitled to qualified immunity on this claim and **GRANTS** Martinez's Motion for Summary Judgment on that basis.

2.   Whether the Right was Clearly Established

Next, the Court must evaluate whether the actions of Officers Perales, Aaron, Brinker, and Sanders were unreasonable in light of the clearly established law at the time of the incident.

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Taylor v. Barkes*, 575 U.S. 822, 825 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). At the time of the incident, it was " 'clearly established that [arrestees have] a constitutional right to be free from excessive force during an investigatory stop or arrest.' " *Doss v. Helpenstell*, 626 F. App'x 453, 459 (5th Cir. 2015) (quoting *Tarver v. City of Edna*, 410 F.3d 745, 753–54 (5th Cir. 2005)) (unpublished). It was clearly established "that an officer violates the Fourth Amendment if he abruptly resorts to

overwhelming physical force rather than continuing verbal negotiations with an individual who poses no immediate threat or flight risk, who engages in, at most, passive resistance, and whom the officer stopped for a minor traffic violation." *Hanks*, 853 F.3d at 747 (citing *Deville*, 567 F.3d at 167–69). It was clearly established that an officer who "quickly escalate[s]" a situation by reaching into a suspect's car and physically striking him "rather than continu[ing] to negotiate" violates the Fourth Amendment where the suspect takes no hostile actions. *Doss*, 626 Fed. App'x. at 459–60. It was clearly established that physical escalation in those circumstances was unreasonable even when the suspect has a gun in the center console. *Id.* The law was also "clear that the degree of force an officer can reasonably employ is reduced when an arrestee is not actively resisting." *Darden*, 880 F.3d at 733. And it was clearly established that "violently slamming or striking a suspect who is not actively resisting arrest constitutes excessive use of force." *Id.*; *see Bush*, 513 F.3d at 502 (concluding that it was objectively unreasonable for an officer to slam an arrestee's face into a car when the arrestee was not actively resisting arrest or trying to flee).

In light of this caselaw, it takes no great leap of logic to conclude that Perales, Aaron, Brinker, and Sanders violated clearly established law at the time of the incident. *Deville*, *Hanks*, and *Doss* make clear that a reasonable officer in the position of Perales, Aaron, or Brinker would have known not to punch someone suspected of committing a nonviolent misdemeanor in the head and throw them out of their car fewer than twenty seconds after starting oral negotiations. That is particularly true where the suspect was complying with the officers' instructions. Similarly, *Darden* and *Bush* make clear that a reasonable officer in Sanders' shoes would have known not to put a knee on a suspected misdemeanant's head and grind their face into the concrete when they were not actively resisting arrest. Consequently, none of these officers can take cover behind the second prong of the qualified immunity inquiry.

18

The officers, for their part, point to two cases to argue that their conduct was sanctioned by clearly established law. First, they direct the Court to *Griggs v. Brewer*, 841 F.3d 308 (5th Cir. 2016). There, an officer conducted a routine traffic stop that escalated into a DUI investigation. *Id.* at 311. During the "one legged stand" test, Officer Brewer told Tanner Griggs (the driver) to stop standing on one leg. *Id.* When Griggs did not stop, Brewer told him to put his hands behind his back and tried to handcuff him. *Id.* Griggs then "lurched to the side and said 'no, no,' " so Brewer "immediately performed a 'takedown' maneuver and threw Griggs face-down onto the nearby grass and landed on top of him." *Id.* Brewer's backup officer, Officer Cruce, came to help restrain Griggs. *Id.* Both officers got on top of Griggs and repeatedly told him to put his hands behind his back. *Id.* When Griggs continued to struggle, "Brewer punched Griggs with a closed fist to the back of the head in an effort to gain control of his arms; when Griggs pulled his arms back again, Brewer punched him several more times to regain control. The officers finally gained control of Griggs's arms and handcuffed him." *Id.*

In that case, the Fifth Circuit affirmed the district court's decision to grant qualified immunity. The Fifth Circuit recognized that "[a] court must measure the force used under the facts as a reasonable officer would perceive them, not necessarily against the historical facts." *Id.* at 313 (citing *Hill v. Carroll Cty., Miss.*, 587 F.3d 230, 234 (5th Cir. 2009)). The Court then concluded that in "a late-night traffic stop involving a clearly drunk and obstinate individual, lurching to the side and stating 'no, no,' in the act of being handcuffed, immediately following the command to 'put your hands behind your back' . . . would, to a reasonable police officer, amount to resistance to arrest." *Id.* But this case is not like *Griggs*. Here, a reasonable officer would not have believed that Heckford was actively resisting arrest. Heckford apparently opened his car door, put his foot out of the car, and grabbed the steering wheel to lift himself out. That is not active resistance. *See*

*Deville*, 567 F.3d at 168 (distinguishing between passive and physical resistance). And the same is true of the few seconds when the officers pinned Heckford to the ground. Additionally, *Griggs* noted that there was "no authority establishing that it was unreasonable for an officer to use non-deadly punches to gain control of the arms of a drunken, actively resisting suspect." *Id.* at 315. Here, however, there was extant authority establishing that it was unreasonable to punch a suspected misdemeanant who was not actively resisting arrest. Thus, the officers' reliance on *Griggs* is misplaced.

Second, the officers cite *Poole v. City of Shreveport*, 691 F.3d 624, 625 (5th Cir. 2012). That case started with Corporal Creighton tailgating Roger Poole on the highway. *Id.* at 625. Poole did not appreciate being tailgated, so he threw something at Creighton's car. *Id.* Creighton then requested backup over the radio. *Id.* Sergeant Stalnaker responded and turned on his lights to stop Poole, but Poole did not pull over. *Id.* Stalnaker then deployed his siren, which Poole finally heeded. *Id.* Stalnaker then ordered Poole to get out of his truck. *Id.* When Poole got out, Stalnaker smelled alcohol. *Id.* At some point during his exchange with the officers, Poole raised his hands at Creighton. *Id.* Stalnaker then told Poole to turn around, and Creighton grabbed his left arm to put it behind his back. *Id.* at 625–26. Poole then backed away, so the officers twisted him around and pressed him against the truck. *Id.* at 626. Next, Creighton held Poole's arm while Stalnaker repeatedly tasered him. *Id.* Stalnaker then tried to grab Poole's other arm, but Poole orally and physically resisted. *Id.* After further resistance, the officers ultimately handcuffed Poole. *Id.* In the process, the officers dislocated Poole's elbow. *Id.*

The Fifth Circuit held that the officers' actions were neither excessive nor clearly unreasonable because Poole's resistance to arrest "was immediate and persistent" in the face of the officers' commands to submit. *Id.* at 629. But *Poole* is also distinguishable. In that case, Poole's

20

assertion that he did not actively resist arrest was "plainly contradicted by the videotape." *Id.* at 631. Here, by contrast, Heckford's assertions that he did not actively resist the officers' commands are not controverted by the visual evidence. Thus, *Poole* does not control the outcome of this case.

Overall, then, the Court holds that at this procedural stage, the actions taken by Officers Perales, Aaron, Brinker, and Sanders were objectively unreasonable in light of clearly established law at the time of the incident. The Court therefore rejects their defense of qualified immunity and **DENIES** their Motion for Summary Judgment on that basis.[5]

### B.    Failure to Intervene and Qualified Immunity

Next, Officers Pecina, Powell, Castillo, Tabor, Van Der Werff, and Warner invoke qualified immunity and move for summary judgment on Heckford's failure-to-intervene claims. At the hearing, Heckford conceded his claims against Officers Pecina, Powell, Van Der Werff, and Warner. As a result, the Court **GRANTS** summary judgment for those officers. That leaves only Officers Castillo and Tabor.

In the Fifth Circuit, a police officer may be liable under § 1983 for failure-to-intervene when they "(1) know[] that a fellow officer is violating an individual's constitutional rights; (2) [have] a reasonable opportunity to prevent the harm; and (3) choose[] not to act." *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013) (citing *Randall v. Prince George's County, Md.*, 302 F.3d 188, 204 (4th Cir. 2002)). An officer must be "present at the scene of the constitutional violation" for liability to attach. *Id.* As with Heckford's excessive-use-of-force claim, the first question is whether Heckford can make out a violation of his constitutional or statutory rights.

---

[5] Officers Perales, Aaron, Brinker, and Sanders also argue, separate from qualified immunity, that their actions were reasonable and did not violate the Fourth Amendment. As addressed in Part III-A-1-(i)–(iv), however, there is a genuine dispute of material fact on that issue. Consequently, the Court also rejects the officers' standalone argument regarding the reasonableness of their actions.

In their sworn declarations, Castillo and Tabor contend that they were not present for Heckford's arrest. The officers aver that they while they were on their way to the Denny's, they were directed to look out for Heckford's car. (Doc. 47-12 at 2.) They then "followed a car which was similar to the suspect's Kia but turned out to be the wrong vehicle." (*Id.*) After abandoning that fruitless pursuit, Castillo and Tabor headed to the Denny's. (*Id.*) By the time they arrived on the scene, Heckford "was already outside his car in handcuffs." (*Id.*) Consequently, these two officers "never witnessed any force applied." (*Id.*) Heckford, in response, directs the Court to the BWC footage, where two officers appear a few feet from Heckford's head at the end of the physical confrontation. But no evidence in the record indicates that those two officers are Castillo and Tabor. What's more, even if those individuals are Castillo and Tabor, no evidence indicates that they arrived in time to prevent the harm to Heckford yet chose not to act. The use of force here occurred in less than one minute. (Doc. 8 at Ex. 4.) This short period, in conjunction with the fact that Heckford cannot identify when Castillo and Tabor arrived, makes it impossible for a reasonable jury to conclude that Castillo and Tabor could have prevented the harm to Heckford but chose not to. The Court therefore holds that Officers Castillo and Tabor are entitled to qualified immunity on this claim and **GRANTS** summary judgment for those officers on that basis.[6]

### C.    *Heckford's Failure-to-Train and Failure-to-Supervise Claims*

Finally, Chief Bruegger, moves for summary judgment on Heckford's failure-to-supervise and failure-to-train claims. To establish liability for Bruegger, Heckford must show that "(1) the police chief failed to supervise or train the officer; (2) a causal connection existed between the failure to supervise or train and the violation of the plaintiff's rights; and (3) the failure to supervise

---

[6] Officers Perales, Aaron, Brinker, Martinez, and Sanders do not address Heckford's failure-to-intervene claim against them, so the claim survives against those officers.

or train amounted to deliberate indifference to the plaintiff's constitutional rights." *Hobart v. Estrada*, 582 F. App'x 348, 356 (5th Cir. 2014).

Like the defendant officers, Chief Bruegger also invokes the defense of qualified immunity. Here, then, Heckford must demonstrate that a reasonable official in Chief Bruegger's shoes would have known that the officers' training and supervision was constitutionally defective. *See Thompson v. Upshur Cty., Texas*, 245 F.3d 447, 460 (5th Cir. 2001) ("[W]hen the defendant moves for summary judgment based on qualified immunity, it is the plaintiff's burden to demonstrate that all reasonable officials similarly situated would have then known that the alleged acts of the defendants violated the . . . Constitution.").

### 1. Failure to Train

The Fifth Circuit has recognized that "culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005). Failure-to-train claims grow even more tenuous when an officer is trained in accordance with state standards. In that scenario, "there can be no cause of action for a failure to train absent a showing that 'this legal minimum of training was inadequate to enable [the officers] to deal with the 'usual and recurring situations' faced by jailers and peace officers.' " *O'Neal v. City of San Antonio*, 344 F. App'x 885, 888 (5th Cir. 2009) (quoting *Benavides*, 955 F.2d at 973); *see Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 170–71 (5th Cir. 2010) (noting that complying with state training requirements counsels against finding a failure to train). This makes sense. In all but the most egregious scenarios, a reasonable police chief would likely not conclude that state training protocols are constitutionally deficient.

Here, the declarations of the officers and Bruegger indicate that the officers were trained according to Texas Commission on Law Enforcement (TCOLE) standards. (*See e.g.*, Doc. 47-1 at

2.) The officers were taught that they "may lawfully: (1) temporarily detain an individual based upon reasonable suspicion he committed, is committing, or about to commit a criminal offense; (2) direct a driver of a vehicle who is suspected of committing a crime to step outside his vehicle; (3) make an arrest where probable cause exists to believe an individual has committed a crime; (4) use reasonable force necessary to defend myself and/or to protect others; and (5) use force reasonably necessary to make a detention or arrest." (*See e.g.*, Doc. 47-2 at 5.) The officers were further "taught, through TCOLE training, that using strikes [in the manner deployed against Heckford can] serve as a pain compliance technique designed to persuade a violently resisting suspect to stop resisting arrest and to submit[.]" (Doc. 47-4 at 4.) The officers were also trained to use "a force continuum authorized by TCOLE" which mandates the use of "measured and ascending responses" in the face of non-compliance with commands and resistance to arrest. (Doc. 47-2 at 6.) This force continuum was further concretized in the reporting form that the Pasadena Police Department used for use-of-force incidents, which guided officers on the appropriate use of force in a given situation. (Doc. 47-4 at 5.) The Pasadena Police Department also maintains a use of force policy, which makes clear that officers are only to use objectively reasonable force. (Doc. 47-1 at 9.) The policy indicates that the reasonableness of an officer's use of force depends on circumstances such as "the seriousness of the crime, the level of threat or resistance presented by the subject, and the danger to the community." (*Id.*) Based on this evidence, it is essentially impossible to conclude that a reasonable police chief in Bruegger's position would have known that the officers were inadequately trained.

Nevertheless, Heckford argues that the officers' training was constitutionally deficient because they were not educated in proper de-escalation techniques. Heckford points to the Sandra Bland Act, effective September 1, 2017, which requires officers to undergo training "on de-

escalation techniques to facilitate interaction with members of the public, including techniques for limiting the use of force resulting in bodily injury." S.B. No. 1849 § 4.02, 85th Leg. (Tex. 2017). Extrapolating from that Act, Heckford concludes that a reasonable chief in Bruegger's position would have known to provide de-escalation training. Heckford also directs the Court to *Macias v. Bexar County*, 2021 WL 4953905 (W.D. Tex. Oct. 25, 2021). There, on a motion to dismiss, the district court reasoned that because the Bland Act increased protections for detainees with mental health issues, a reasonable sheriff would have known to train employees to evaluate detainees for mental healthcare needs. *Id.* at *5. But there is a substantial gap between *Macias* and this case. After all, several courts have recognized that de-escalation training "is beyond the scope of the inquiry mandated by . . . federal law, which require[s] that an officer use reasonable, not optimal, force." *Tanberg v. Sholtis*, 401 F.3d 1151, 1162 (10th Cir. 2005).

Even more critically, Heckford does not direct the Court to any clearly established law that would have instructed Bruegger that a lack of de-escalation protocols rendered his officers' training constitutionally deficient. Consequently, Heckford has not discharged his burden of demonstrating that "every reasonable official would have understood" that Bruegger's actions threatened to violate his rights. *See Taylor*, 575 U.S. at 825 (quoting *Reichle*, 566 U.S. at 664). Thus, notwithstanding the passage of the Bland Act, Heckford has not shown that it was clearly established that Bruegger's training efforts could give rise to liability for failure to train.[7] The Court therefore holds that Bruegger is entitled to qualified immunity on Heckford's failure-to-train claim and **GRANTS** Bruegger's Motion for Summary Judgment on this claim.[8]

---

[7] Because the Court holds that Bruegger is entitled to qualified immunity based on the "clearly established law" prong, it need not reach the parties' arguments on whether Heckford makes out a violation of his rights. *Pearson*, 555 U.S. at 242.

[8] Heckford also argues that the defendants' responses to discovery requests have been "evasive or

2.  <u>Failure to Supervise</u>

The parties lump Heckford's failure-to-train and failure-to-supervise claims together, but the Court must address them separately. Still, Heckford's failure-to-supervise claim rests on the same three prongs as his failure-to-train claim: (1) Bruegger failed to supervise the officers; (2) a causal connection existed between Bruegger's failure to supervise and the violation of Heckford's rights; and (3) Bruegger's failure to supervise amounted to deliberate indifference to Heckford's rights. *Hobart*, 582 F. App'x at 356. Ultimately, however, the same problem that plagues Heckford's training claim also dooms his supervision claim.

In his declaration, Bruegger describes the supervision protocols in place at the Pasadena Police Department. New officers who complete TCOLE training and pass the Texas state peace officer examination undergo on-the-job training through a field training officer (FTO) program. (Doc. 47-1 at 3.) That program, which uses TCOLE-approved instruction, ensures that "new officers are extensively supervised with experienced officers who have been specially trained

---

incomplete," so further discovery is needed under Federal Rule of Civil Procedure 56(d). (Doc. 55 at 51, 53.) Rule 56(d) provides that, "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." FED. R. CIV. P. 56(d). Motions for additional discovery under Rule 56(d) are " 'broadly favored and should be liberally granted' because the rule is designed to 'safeguard non-moving parties from summary judgment motions that they cannot adequately oppose.' " *Raby v. Livingston*, 600 F.3d 552, 561 (5th Cir. 2010) (quoting *Culwell v. City of Fort Worth*, 468 F.3d 868, 871 (5th Cir. 2006)). Still, a nonmovant "may not simply rely on vague assertions that additional discovery will produce needed, but unspecified, facts." *Id.* (quoting *SEC v. Spence & Green Chem. Co.*, 612 F.2d 896, 901 (5th Cir. 1980)). Here, no amount of discovery will change the fact that Heckford's failure-to-train claim is not founded on law that was clearly established at the time of the incident. Consequently, additional discovery would not help Heckford respond to this Motion. *See Chevron U.S.A., Inc. v. Traillour Oil Co.*, 987 F.2d 1138, 1155–56 (5th Cir. 1993) (holding that the non-movant must "demonstrate to the district court specifically how the requested discovery pertains to the pending motion"). The Court therefore declines Heckford's request under Rule 56(d).

through TCOLE to administer the FTO program." (*Id.* at 4.) Officers are not permitted to perform duties without direct supervision until they demonstrate competence in the FTO program. (*Id.*) The field training officers are also supervised to ensure "accountability and compliance with TCOLE standards." (*Id.*) What's more, there are several supervisory ranks within the Pasadena Police Department, and "[s]upervisors must fulfill Texas civil service, and TCOLE standards and earn promotions through a competitive process that requires experience, testing of competency on legal and professional knowledge, and demonstration of leadership skills." (*Id.* at 6.) The Department also has an office of professional standards that investigates misconduct and subjects offending officers to disciplinary action. (*Id.* at 7.) The Department's use of force policy requires officers to intervene when they see another officer using objectively unreasonable force and report the incident to a supervisor. (*Id.* at 10.) Finally, the Department requires officers to submit documentation and undergo a review when they use physical force. (*Id.*)

In the face of these supervisory protocols, Heckford maintains that Bruegger is liable for failing to supervise the officers based on three pieces of evidence. First, Heckford notes that the officers stated that their actions "did not differ from the customs, policies, and practices of Chief Bruegger's Pasadena Police Department." (Doc. 55 at 4–5 (cleaned up).) Second, Heckford observes that "only a month after the incident, Chief Bruegger gave these officers and the others involved top-notch performance reviews" and confirmed that Perales "should continue on his path . . . as an informal leader . . . [and] assist in training younger officers." (*Id.* at 5, 24–25.) And third, Heckford states that Bruegger said that the officers did not violate departmental policies. (*Id.*) But even though Heckford bears the burden of overcoming Bruegger's defense of qualified immunity, he points to no law or case that clearly establishes that a chief of police can be held liable for employing the type and scope of supervisory protocols featured by the Pasadena Police

Department. It is therefore not clear that "every reasonable official would have understood that what [Bruegger was] doing violate[d]" Heckford's rights. *See Taylor v*, 575 U.S. at 825 (quoting *Reichle*, 566 U.S. at 664). As a result, Heckford again fails to discharge his burden of demonstrating that Bruegger's actions violated clearly established law. Consequently, the Court holds that Bruegger is entitled to qualified immunity on Heckford's failure-to-supervise claim and **GRANTS** Bruegger's Motion for Summary Judgment on this claim.

## IV.   CONCLUSION

For the foregoing reasons, the Court:

➢ **HOLDS** that Officers Perales, Aaron, Brinker, and Sanders are **NOT ENTITLED** to qualified immunity on Heckford's excessive-use-of-force claim and **DENIES** their Motion for Summary Judgment on that claim;

➢ **HOLDS** that Officer Martinez **IS ENTITLED** to qualified immunity on Heckford's excessive-use-of-force claim and **GRANTS** his Motion for Summary Judgment on that claim;

➢ **GRANTS** summary judgment for Officers Pecina, Powell, Van Der Werff, and Warner on Heckford's failure-to-intervene claim;

➢ **HOLDS** that Officers Castillo and Tabor **ARE ENTITLED** to qualified immunity on Heckford's failure-to-intervene claim and **GRANTS** their Motion for Summary Judgment on that claim;

➢ **HOLDS** that Chief Bruegger **IS ENTITLED** to qualified immunity on Heckford's failure-to-train and failure-to-supervise claims and **GRANTS** his Motion for Summary Judgment on those claims; and

➢ **DENIES** Heckford's request for additional discovery under Rule 56(d).

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this 21st day of January, 2022.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE